GLENS FALLS INSURANCE COM-
PANY, Plaintiff-Appellee,

v.

DANVILLE MOTORS, INC., Defendant-
Appellant.

GLENS FALLS INSURANCE COM-
PANY, Plaintiff-Cross-Appellant,

v.

DANVILLE MOTORS, INC., Defendant-
Cross-Appellee.

Nos. 15421, 15422.

United States Court of Appeals
Sixth Circuit.

June 20, 1964.

**188**

Pierce Lively, and James F. Clay, Danville, Ky., for Danville Motors, Inc.

William A. Miller, Louisville, Ky., for Glens Falls Ins. Co.

Before WEICK, Chief Judge, and O'SULLIVAN and EDWARDS, Circuit Judges.

O'SULLIVAN, Circuit Judge.

Glens Falls Insurance Company, plaintiff-appellee, sues in this diversity action as subrogee of its insured, the owner of an apartment building located in Danville, Kentucky. This building was destroyed by a fire which started in adjoining premises used by defendant-appellant, Danville Motors, Inc., to operate a garage for the sale, service and repair of automobiles. After paying $57,178.21 to its insured for the loss of its building, plaintiff brought this action to recover such sum from defendant, claiming that the fire was caused by negligence of an employee of defendant. The cause was tried to the District Judge who gave judgment for plaintiff in the above amount, but denied a request that interest on the amount of the judgment (entered April 2, 1963) be allowed from the date when the complaint was filed, August 31, 1960.

On this appeal, defendant asserts that the evidence does not support the District Judge's finding of fact of actionable negligence. For this alleged error, defendant asks reversal, with a direction to enter judgment dismissing the complaint. Defendant further contends that the District Judge improperly admitted and considered evidence of defendant's alleged violation of certain Standards of Safety promulgated by the Kentucky State Fire Marshal. For this alleged error, defendant asks reversal and a new trial. Plaintiff has cross-appealed, asserting error in the District Judge's refusal to allow interest on its claim from the date of filing its complaint.

1) *Sufficiency of the evidence.*

The fire causing the insured's loss started in defendant's garage while one of its workmen, one Weldon, was draining a leaking gas tank on a truck. To accomplish the draining, the workman first placed the truck on a hoist and raised it about two feet. Using a so-called "creeper," he propelled himself under the truck and reached up with a wrench to take out the tank's drainage plug, having placed a pan made of a cut off portion of an oil drum under the tank. The plan of operation was to allow the gasoline to flow openly from the tank into the pan. Having partially loosened the plug, which caused the gasoline to drain out in a small stream, the workman left the place of operation to get some further tools, including additional wrenches. Returning to his job, he got back on the creeper, pushed himself under the truck, and reached up to get hold of the drainage plug. During his work he had been using a wrench made of a ferrous metal, some other tools whose metal content was not determined, and the creeper, a flat device with four wheels designed to allow workmen to lie on it while working beneath vehicles. The evidence did not disclose whether the wheels on the particular creeper were metal, wood or rubber, although such wheels are generally made of metal. When Weldon reached up to get hold of the drainage plug in the gas tank, the tank being at the rear of the vehicle, he heard a noise, "a whoomph," and felt heat on his back. He turned and saw a flame toward the front of the truck, "under the oil pan." The flame appeared to be two or three inches off the floor. It went immediately to the

pan into which the gasoline had been draining and thereupon the fire spread through the garage and the adjoining apartment building. The appearance and progress of the flame was described by the witness as follows:

"Q. Was there anything known to you of any combustible nature where the flame was located which could have been the subject or the reason for this flame burning other than the gasoline vapor?

"A. No, sir.

"Q. Did the flame trail back into the pan as if following a trail of fumes?

"A. Yes, sir."

The workman testified that he knew the method he was using to drain the gasoline would permit vapors to spread to the surrounding area, and that gasoline vapors or fumes are very easily ignited. He stated that he did not direct any fan "or anything of that sort" over the pan or in its vicinity to disperse the gasoline fumes. There were ventilating fans in the building which were in operation and the testimony as to their location, and the location of the truck being repaired and its relative position to walls and other vehicles which may have been obstructions, left uncertainty as to how effective the ventilation system may have been. There was evidence that the truck with gasoline leaking or flowing from it into the pan, had been upon the hoist fifteen to thirty minutes before the fire started.

Two witnesses for plaintiff, one an engineering professor and the other a man experienced in the operation of a repair garage, testified that the method used by defendant's workman to drain the tank was dangerous and not in keeping with safe methods known and used in like establishments. Their criticism of defendant's method was directed primarily at allowing an open flow within an enclosure. Safer and customary methods described included draining outside of a building and, in enclosed areas, siphoning and the use of funnels, hoses and cans with small openings, all for the purpose of preventing the gathering and concentration of gasoline fumes.

Plaintiff's expert witness, Dr. Myron Howard Chetrick, Director of the University of Louisville Institute of Industrial Research, and Professor of Engineering Research, testified that the open flow of gasoline into the oil drum pan was calculated to create a dangerous accumulation of gasoline vapors; that a spark from any source intruded into such an accumulation would ignite it; that the ignition would take place "at the point of gas concentration in combustible limits closest to the point where the spark occurred." Dr. Chetrick could not identify the source of the spark that triggered the fire here involved, but stated that it could have come from one of several sources—the movement on the concrete floor of the metal wheels of the creeper, if it had them, the striking of a ferrous metal tool or tools upon the concrete or upon each other, friction at the drainage plug or the striking of the gasoline upon the metal pan into which it was flowing.

Opposed to plaintiff's witness were several called by defendant, who testified that the method employed by defendant's workman, Weldon, was the same as that used by them, and others, in carrying on garage operations in like circumstances.

From the evidence before him, the District Judge concluded:

"The testimony seems convincing that the method used by the defendant's employee in draining the gasoline from the gasoline tank of the automobile * * * by open flow of the stream from an elevation of two feet or more constituted negligence, and that such negligence was the proximate cause of the conflagration * * *."

Appellant's attack upon the District Judge's conclusion arises almost entirely from the court's description of Weldon's method of draining "by open flow of the stream from *an elevation of two feet or more.*" (Emphasis supplied.) We

are not sure that we understand appellant's position, so to expose it we quote counsel's words:

> "We now come to the conclusion of the court that permitting gasoline to drain from an elevation of two feet or more was negligent. Quite frankly, the idea that the court would seize upon the *elevation* from which gasoline would be permitted to flow as a basis for determining negligence or the absence thereof is an idea which no one expected. Neither party directed proof toward this aspect of the case. Plaintiff-appellee took the position that permitting gasoline to be drained by an open stream through the air from any height was negligent." (Emphasis supplied.)

■ We conclude from this that it is defendant's contention that the court's reference to this dimension of two feet indicates that the finding of negligence was based solely on the height of the tank, and that this conclusion is without foundation since no witness specifically testified that the method employed was negligent solely because of the tank's height. Several of the defendant's witnesses, indeed, testified that they employed similar open flow methods in conducting similar operations. The criticism of the plaintiff's witnesses, on the other hand, was directed primarily at the method of allowing an open flow of gasoline within a building instead of going outside the building, or using hoses, siphoning, etc. in order to reduce the opportunity for the gasoline to vaporize. The District Judge's emphasis on the height of the tank, however, seems to be intended not as the sole basis for finding negligent the method employed, but rather as a basis for reconciling the testimony of the defendant's witnesses with his finding by showing that even though they used similar methods they decreased the risk by keeping the gas tank closer to the receptacle. Aside from this distinction, the fact that others used the same method would not bar the District Judge from concluding that such method constituted negligence. Texas & Pac. Ry. v. Behymer, 189 U.S. 468, 470, 23 S.Ct. 622, 47 L.Ed. 905, 906 (1903); American Coal Co. v. De Wese, 30 F.2d 349 (4th Cir. 1929). In a state court lawsuit arising from the same fire as involved here, a jury exonerated defendant from liability to the owner of some personal property damaged by the fire. On appeal, however, the Kentucky Court of Appeals noted that "a jury may have found him [Weldon] negligent in adopting this particular method * * *." McKinley v. Danville Motors, Inc., 374 S.W.2d 366, 367 (Ky. 1964).

■■ Defendant further asserts that the District Judge's finding was based upon conjecture and speculation because there was no evidence that the spark which ignited the gasoline vapors was caused by some act of defendant's employee. We think that the factfinder could validly draw the inference that it did result from the activities of defendant's mechanic in the area where the gas fumes were collecting, in view of the testimony of plaintiff's witness Chetrick, noted above. The dangerous situation having been created by the mechanic's negligence, it was not essential that specific identification of the origin of the spark be made. Miles v. Southeastern Motor Truck Lines, Inc., 295 Ky. 156, 173 S.W.2d 990 (1943); Watson v. Ky. & Ind. Bridge & Ry. Co., 137 Ky. 619, 126 S.W. 146, 129 S.W. 341 (1910); see Bryant v. Ellis, 222 Ky. 272, 276, 300 S.W. 610, 612 (1927). For the law of other states, see, e. g., Wichita City Lines, Inc. v. Puckett, 288 S.W.2d 122 (Tex.Civ.App. 1956). In the state case arising from this same fire, McKinley v. Danville Motors, Inc., supra, the Kentucky Court of Appeals noted that:

> "The ultimate issue was whether defendant's employee negligently created the condition which constituted a fire hazard. *It was immaterial from what source the gasoline fumes were ignited.*" 374 S.W.2d 367. (Emphasis supplied).

The District Judge's findings of fact are not clearly erroneous.

**2)** *Evidence of Kentucky Standards of Safety.*

Over defendant's objection, plaintiff introduced in evidence sections of Kentucky Administrative Regulations promulgating certain Standards of Safety governing the storage, handling and transportation of flammable liquids, including gasoline. At the trial of McKinley v. Danville Motors, Inc., supra, the state court action already noted, the trial judge had ruled that such Standards of Safety did not apply to the conduct of defendant's employee, Weldon. The Kentucky Court of Appeals sustained this action, holding that these Standards of Safety were intended to apply "to use and dispensing of flammable liquids," and that

> "Defendant's employee was not using or dispensing gasoline as a part of some commercial or industrial operation. He was confronted with an emergency situation which he undertook to rectify by draining a tank in order to repair it. A jury may have found him negligent in adopting this particular method, but his conduct under these unusual circumstances was not within the scope of the specific safety regulations." (374 S.W.2d 367)

In the present case, the District Judge rendered an opinion in which he found that defendant's employee was guilty of ordinary negligence. No reference is made by him to any claimed violation of the Standards of Safety, and it is quite apparent that he placed no reliance upon such standards in finding actionable negligence. This was not a jury trial, and we find no reversible error in admitting these Standards into evidence.

**3)** *Allowance of interest prior to judgment.*

Plaintiff-appellee, in its cross appeal, charges error in the District Judge's refusal to award interest on its claim from and after the date of the filing of its Complaint. The Complaint, filed August 31, 1960, averred the payment of $57,-178.21 to settle the loss of its insured and asked for judgment in that amount. By an Amended Complaint, filed December 29, 1960, it asked for interest on such amount from the date of filing the action. On May 25, 1962, in response to plaintiff's Request for Admissions, defendant conceded that the sum claimed correctly represented the loss suffered. Plaintiff asserts that although this was a tort action, it was for a liquidated amount and, therefore, interest should be awarded.

The Federal statute, 28 U.S.C.A. § 1961, provides that interest on money judgments in civil cases in a district court shall be "calculated from the date of entry of the judgment, at the rate allowed by State law." In diversity cases, Federal courts follow state law on the question of interest before judgment. Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477. The Kentucky statute provides, in part, "A judgment shall bear legal interest from its date. * * *" (K.R.S. § 360.040.) The mentioned Federal and Kentucky statutes, providing for interest on judgments after the entry thereof, are not necessarily dispositive of the question before us. Without attempting review of cases from other states which treat this subject, we believe that under Kentucky law, applied to the facts of this case, the allowance of interest prior to judgment was within the discretion of the district judge. Schulte v. Louisville & Nashville R.R. Co., 128 Ky. 627, 634–635, 108 S.W. 941, 942–943. See Pope's Adm'r v. Terrill, 308 Ky. 263, 214 S.W.2d 276; Louisville & I. R. Co. v. Schuester, 183 Ky. 504, 209 S.W. 542, 4 A.L.R. 1344. These cases hold that whether interest should be awarded prior to judgment on claims for negligent damaging of personal property was within the discretion of the jury. The defendant here could have, within the rules of pleading, put plaintiff to its proof of the value of the damages to the premises of plaintiff's insured. It should not be punished for its counsel's courtesy and good sense in conceding the amount. We affirm the disallowance of interest prior to judgment.

Judgment affirmed.